William Stratman v. Commissioner.
Stratman v. Commissioner
Docket No. 16209.
United States Tax Court
1949 Tax Ct. Memo LEXIS 161; 8 T.C.M. (CCH) 560; T.C.M. (RIA) 49143; June 7, 1949
*161 Elmer B. Mau, Esq., for the petitioner. David F. Long, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner challenges respondent's determination of deficiencies in income tax and assessment of penalties for negligence as follows: Year
Deficiency
5% Penalty
1944
$1,581.58
$79.08
1945
1,826.86
91.34 The above deficiencies resulted from respondent's action in adding to petitioner's reported income from a tavern business the amounts of $7,886.65 and $8,110.19 for the years 1944 and 1945, respectively. Some of the facts have been stipulated. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner is an individual residing in the village of Bangor, La Crosse County, Wisconsin. He filed Federal income tax returns for the years 1944 and 1945 with the collector of internal revenue for the district of Wisconsin. In March, 1941, petitioner moved to the village of Bangor from a farm where he had been engaged for many years in farming. At that time he received $3,251.30 from an auction sale of his personal property, and from these proceeds he discharged a *162 chattel mortgage in the amount of $1,500, and made a loan to his cousin in the amount of $700. At about the same time petitioner received $700 from the sale of cattle and $400 from the sale of an accordion. During the year 1941 he purchased an automobile, for which he paid $400 in addition to a trade-in allowance on his old car. Petitioner did not file Federal income tax returns for years prior to 1942. On or about July 1, 1942, petitioner purchased a retail tavern business in the village of Bangor from a man named Schrader for $1,518.24, of which he paid $200 down and gave a mortgage for the balance. Petitioner had discharged the mortgage by February 14, 1944, by payments of $50 per month. Petitioner continued to operate the tavern until the year 1948. His formal schooling had been cut short by his father's death when he was 14 years of age, and his knowledge of bookkeeping methods was meager. The only record he kept of income received in operating the tavern was a small journal in which he entered readings of the cash register. It was his custom to take a cash register reading and record its total in the journal at the close of each day's business, or at most, every two or three *163 days, during the taxable years. Schrader had used the same method of recording receipts when he operated the tavern. Petitioner made no attempt to reconcile cash on hand with the cash register readings. Of about 645 journal entries for the years 1944 and 1945, all made in pencil and varying in amounts from $8.20 to $387, about 140 entries were in dollar amounts evenly divisible by 10, and about 522 entries were in even dollar amounts. Nine entries were changed or stricken. The aggregate of journal entries for the taxable years is as follows: Year
Total Entries
1944
$26,529.40
1945
30,336.98
It was petitioner's practice to take the money from his cash register without counting it, and place it in a bag. He paid most of his bills, including those for living expenses, with cash from the bag. He kept no record of tavern operating expenses or of merchandise costs, except that he retained invoices covering purchases of beer, wine, liquor, candy, cigarettes, and soft drinks. A schedule showing the aggregate purchases of merchandise for sale in the tavern during the period from July 1, 1942, through the year 1945, as prepared by the examining deputy collectors from *164 purchase invoices in petitioner's possession, is as follows: 1942
1943
1944
1945
Liquor and Wine
$2,200.27
$ 4,182.82
$ 8,772.29
$ 9,150.58
Candy, Cigars, Cigarettes, Soft Drinks, etc.
1,592.12
4,230.05
4,279.87
3,852.82
Beer
1,914.44
7,846.53
13,901.13
14,456.32
Total Invoices on Hand
$5,706.83
$16,259.40
$26,953.29
$27,459.72
Beer Invoices Missing
none
2,329.10
none
none
Total Purchases
$5,706.83
$18,588.50
$26,953.29
$27,459.72
As disclosed by the invoices, petitioner's purchases of liquor and wine for the years 1944 and 1945, at aggregate costs of $8,772.29 and $9,150.58, respectively, were in the following units: Units
1944
1945
Cases
46 1/2
42 1/2
Gallons
6
3
Half gallons
16
48
Quarts
272
293
Fifths
2,453
3,223
Tenths
71
54
Pints
512
662
Half pints
20
292
Other bottles
24
none
As disclosed by the invoices, petitioner's purchases of beer for the years 1945, at aggregate costs of $13,901.13 and $14,456.32, respectively, were in the following units: Units
1944
1945
One-half barrels
329
302
Cases
4,841
5,205 The invoices also disclose that in *165 the years 1944 and 1945 petitioner returned and received credit for approximately 4,830 and 5,159 empty beer cases, respectively. Each case of liquor and wine included in petitioner's purchases contained 12 fifths, and each case of beer contained 24 12-ounce bottles. Petitioner operated his tavern 7 days a week until 11 P.M. and on a cut-rate basis, in order to increase his volume of sales. The village of Bangor had a population of about 800, and at least 4 taverns, including petitioner's, which were in active competition. During the taxable years petitioner's tavern did as much business as any tavern in town. Petitioner followed a liberal policy in giving free drinks to customers, and did not require deposits on beer cases even though at that time petitioner was charged $1.25 for each empty case, and failure of customers to return the cases would considerably reduce his profits. He extended credit in the taxable years, and debts of at least $400 incurred at that time are still outstanding. Drinks were priced below O.P.A. limits. Beer was sold by the glass for 5 and 10 cents, and by the case for as low as $2.25, a mark-up of about 10 cents. Liquor was sold for about 15 and 20 cents *166 per single drink, called a "shot," and for as low as $2.50 to $3.00 per fifth. Wine was sold for as low as 75 cents per fifth. As disclosed by the invoices, about 140 different brands of liquor and wine were handled by petitioner's tavern during the taxable years. The liquor varied in cost from about $2.57 to $3.80 per fifth, and $1.68 to $2.38 per pint. The wine was invoiced at from about 75 cents to 88 cents per fifth. Of about 11 brands of beer purchased during the same period, as disclosed by the invoices, the cost per half barrel was about $8.75. Something less than half of all liquor was sold in shots. 100 percent profit was realized on these sales. More than half of the bottled beer was sold by the case. About three-fourths of all soft drinks were sold by the case at a mark-up of five cents per case. Candy and cigarettes were sold about at cost. The competing taverns followed petitioner's lead in price cuts, and eventually prices were about uniform in all taverns. Petitioner's son, Wilferd Stratman, worked in the tavern as bartender in 1944 from January to June, and in 1945 from May to the end of the year. During the remainder of the taxable years Wilferd served in the Navy, *167 and petitioner employed at least one bartender to take his place. Petitioner dit not keep any written record of amounts paid for labor. In October, 1945, petitioner made a loan to Wilferd of $2,000 to purchase a milk route which was operated by Wilferd until the year 1947. Income earned from the milk was reported by Wilferd in his tax returns, but petitioner kept all the profits. An undisclosed amount of profits was earned in the year 1945, and the net profits reported by Wilferd for the years 1946 and 1947 were $2,862.28 and $967.04, respectively. During the taxable years petitioner lived with his wife who depended upon him for support. Their living expenses included rent at about $22 per month and food at about $25 per month. Petitioner's clothing expenses were low. In a period of about 25 years since his marriage he had purchased only one complete suit of clothing. His wife had no more than two new dresses each year. Recreation expenses consisted of about two movies per month and a short automobile drive occasionally. During the taxable years petitioner purchased war bonds for $300. In a letter written in the year 1944 to his son, Maynard Stratman, who was serving with the armed *168 forces, petitioner mentioned plans to sell the tavern since he "didn't figure it was making money." At the time of the hearing in this proceeding, the outstanding debts owed by petitioner included about $4,000 to Milton Jones, about $550 to First National Bank, about $250 for twine, about $150 for a furnace, about $100 for lumber, and about $40 for an electric fence. In his returns for the years 1942, 1944, and 1945, petitioner reported income from his tavern as follows: 1942
1944
1945
Opening Inventory
$ 628.85
$ 750.00
$ 2,023.75
Purchases
4,580.63
26,466.78
28,666.86
Other costs
351.00
none
none
Labor
none
890.00
1,560.00
Total
$5,560.48
$28,106.78
$32,250.61
Less: Closing Inventory
600.00
2,023.75
2,069.00
Cost of Goods Sold
$4,960.48
$26,083.03
$30,181.61
Business Expenses
330.00
1,094.65
996.60
Total
$5,290.48
$27,177.68
$31,178.21
Total Receipts
7,187.00
26,352.90
30,607.00
Net Profit (or Loss)
$1,896.52
($ 824.78)
($ 571.21) The business expenses included rent, electricity, water, fuel, repairs, license, advertising, loss from burglary, tavern league dues, taxes, laundry, telephone, and depreciation. *169 One of the two examining deputy collectors of internal revenue assigned to petitioner's case was Arnold Kahler. He first attempted, unsuccessfully, to verify the returns by reference to petitioner's only records, the journal and invoices. Secondly, he attempted to compute petitioner's income on the net worth basis but "could not find very much net worth because he [petitioner] does his business by cash." It was finally decided to compute income by a mark-up system. Kahler and the other deputy determined that petitioner's return for the year 1942 showed a mark-up of 56 percent, which resulted from using the amount of $4,580, reported in the return as purchases. If the amount of $5,706.83, as disclosed by the invoices, had been used in Kahler's computation the mark-up for the year 1942 would have been about 25 percent. Kahler had audited returns of about 80 percent of the taverns in the La Crosse division which includes the village of Bangor. He concluded that while the lowest mark-up was 33 1/3 percent, the average mark-up used by taverns in the village of Bangor during the taxable years was 50 percent. In computing petitioner's income for the years 1942, 1944, and 1945, Kahler *170 used a mark-up of 50 percent and allowed deductions for business expense based upon 12 percent of sale for the year 1942 and 15 percent of sales for the years 1944 and 1945. This computation is as follows: 1942
1943
1944
1945
Opening Inventory
$ 628.85
$ 600.00
$ 750.00
$ 2,023.75
Purchases
5,706.83
18,588.50
26,953.29
27,459.72
Total
$6,335.68
$19,188.50
$27,703.29
$29,483.47
Less: Closing Inventory
600.00
750.00
2,023.75
2,069.00
Cost of Goods Sold
5,735.68
18,438.50
25,679.54
27,414.47
Mark-up (50% of Cost)
2,867.84
9,219.25
12,839.77
13,707.24
Corrected Sales
$8,603.52
$27,657.75
$38,519.31
$41,121.71
Gross Profit on Sales
2,867.84
9,219.25
12,839.77
13,707.24
Ordinary Business Expenses
$1,032.42
$ 3,318.93
$ 5,777.90
$ 6,168.26
Correct Business Profit
$1,835.42
$ 5,900.32
$ 7,061.87
$ 7,538.98
Business Income Reported
1,896.52
2,087.90
(824.78)
(571.21)
Additions to Income
($ 61.10)
$ 3,812.42
$ 7,886.65
$ 8,110.19
In his notice of deficiency, respondent added the amounts of $7,886.65 and $8,110.19 to petitioner's reported income for the years 1944 and 1945, respectively, and assessed 5 *171 percent negligence penalties "for failure to keep adequate records." In the years 1946 and 1947, Wilferd worked for petitioner as bookkeeper and kept detailed records of receipts and expenses. He also increased the mark-up on all merchandise. On January 1, 1948, Wilfred began operating the tavern on his own. Operations of the tavern for the years 1946 and 1947 as reported by petitioner in his return, and a statement of operations by Wilferd for the first six months of the year 1948, are as follows: 1946
1947
1949 (1/2)
Gross Receipts
$35,748.68
$41,369.87
$21,455.92
Cost of Goods Sold
28,160.60
28,434.96
15,063.17
Gross Profit
$ 7,588.08
$12,934.91
$ 6,392.75
Expenses
5,234.48
9,890.39
3,876.17
Net Profit
$ 2,353.60
$ 3,044.52
$ 2,516.58
Petitioner realized no net income from the operation of his tavern in 1944 or 1945. Opinion We do not have to say here, as was held in Helvering v. Taylor, 293 U.S. 507, that respondent's determination of the deficiency in controversy was arbitrary, and that as a consequence no burden rests upon petitioner to demonstrate with exactitude the income which he did receive. See Wolder, "Limitations *172 on the Commissioner's Power," Taxes, January, 1949, pp. 22, 25. But we are satisfied that by the method used respondent arrived at an excessive figure, and that petitioner's mark-up was not even in the general neighborhood of that employed by the revenue agent. See G. A. Miller, 6 B.T.A. 401. The preponderance of the evidence satisfies us that petitioner's mark-up was so low, and that his operations were so unbusinesslike, consistent as they were with his apparent incapacity to cope with the problems of keeping the business books, that they resulted in large discrepancies between amounts he should have received even on the basis of a moderate mark-up and amounts actually collected. Whether we say that the evidence convinces us that there is no deficiency, or that at least petitioner has made a sufficient showing to shift the burden of going forward to respondent, see Kern v. Poe (D.C.), 8 Fed. Supp. 942; B. F. Edwards, 39 B.T.A. 735, acq. 1939-1 C.B. 11, the conclusion remains as set forth in our findings that on the record before us petitioner had no net income from his tavern, and that accordingly his failure to report any was *173 consistent with his actual operations. The penalty of course falls equally with the tax. Decision will be entered for the petitioner.